**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| CENTERPOINT ENERGY SERVICES, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:10-cv-2121 |
| WR PROPERTY MANAGEMENT, LLC, CAMEEL HALIM, HODA HALIM, THE CAMEEL HALIM LIVING TRUST DATED OCTOBER 24, 1996, and THE HODA HALIM LIVING TRUST DATED OCTOBER 24, 1996, | ) ) ) ) ) ) ) | Judge Virginia M. Kendall |
| Defendants. | ) | |

**CENTERPOINT'S MEMORANDUM IN SUPPORT OF ITS**
**<u>MOTION FOR SUMMARY JUDGMENT</u>**

Dated: July 20, 2011

Respectfully submitted,

/s/ Robert J. Palmersheim
One of the attorneys for Plaintiff CenterPoint
Energy Services, Inc.

Steven A. Weiss
Robert J. Palmersheim
Lesley G. Smith
Anand C. Mathew
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
312.701.9300

207165_8.DOC

## <u>TABLE OF CONTENTS</u>

**FACTUAL BACKGROUND** ......................................................................................... 2

    A.   The Halims Own Wilmette And Over 40 Other Companies. ....................................... 2

    B.   The Halims Use Wilmette's "Trust" Account To Run Nearly All Their Businesses..... 2

    C.   The Halims Deposit And Withdraw Money From Wilmette's "Trust" Account
        To Keep It At A "Zero Balance." ............................................................................. 3

    D.   After CES Filed Suit, The Halims Transferred Wilmette's Business To A New
        Company And Shut Down Wilmette. ........................................................................ 4

**ARGUMENT** .............................................................................................................. 5

  **I.**    **THE UNDISPUTED FACTS SHOW THAT THE HALIMS ARE
        WILMETTE'S ALTER EGO** .......................................................................... 5

    A.   The Unity Of Interest Factors Favor Piercing Wilmette's Veil To Reach The Halims.. 6

       1.   The Halims Never Capitalized Wilmette. ................................................................ 7

       2.   The Halims Shut Down Wilmette In 2008 And Left Wilmette Insolvent. ................. 8

       3.   The Halims Ignored Their Obligations Under Wilmette's Operating Agreement. .... 8

       4.   The Halims Commingled Wilmette's Funds With Funds From Their Other
           Companies And Their "Personal" Funds. .......................................................... 9

       5.   The Halims Diverted Over $10 Million From Wilmette To Themselves Over The
           Course Of Four Years. ...................................................................................... 10

       6.   The Halims Failed To Maintain Arms-Length Relationships Between Wilmette
           And Their Other Companies. ............................................................................. 10

       7.   The Halims Used Wilmette As A Mere Façade To Conduct Their Personal
           Business And The Business Of Their Other Companies. ........................................ 11

    B.   Failing To Pierce Wilmette's Veil To Reach The Halims Would Sanction A Fraud
        And An Injustice. ............................................................................................. 12

  **II.**   **THE UNDISPUTED EVIDENCE SHOWS THAT DEFENDANTS
        FRAUDULENTLY TRANSFERRED OVER $10 MILLION DOLLARS FROM
        WILMETTE.** .................................................................................................. 13

A.   The Halims Did Not Provide Wilmette With Anything Of A Reasonably Equivalent Value In Exchange For Their Transfers. .................................................... 14

B.   Wilmette Was Insolvent At The Time Of The Transfer, Became Insolvent As A Result Of The Transfer, And/Or Knew That It Could Not Pay Its Debts As They Became Due. ........................................................................................... 16

III.  **THE UNDISPUTED FACTS SHOW THAT WR IS THE SUCCESSOR COMPANY OF WILMETTE.** ..................................................... **17**

A.   WR Expressly Assumed Wilmette's Obligations and Liabilities. ............................... 17

B.   WR Is The Mere Continuation Of Wilmette ................................................................. 18

**CONCLUSION** ............................................................................................ 20

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Automotive Fin. Corp. v. Joliet Motors, Inc.*, 761 F. Supp. 2d 789 (N.D. Ill. 2011).............. 10, 12

*Brandon v Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594 (7th Cir. 2005)..................... 20

*Flentye v. Kathrein*, 485 F. Supp. 2d 903 (N.D. Ill. 2007) ................................................................. 6

*Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997). ..................... 14

*Grochocinski v. Schlossberg*, 402 B.R. 825 (N.D. Ill. 2009)........................................................... 14

*Hoppa v. Schermerhorn & Co.*, 259 Ill. App. 3d 61 (1st Dist. 1994)..................................... 17, 19

*In re H. King & Assocs.*, 295 B.R. 246 (N.D. Ill. Bankr. 2003) ............................................. 18, 19

*In re Joy Recovery Tech. Corp.*, 286 B.R. 54 (N.D. Ill. Bankr. 2002). ......................................... 15

*In re Polo Builders, Inc.*, 388 B.R. 338 (N.D. Ill. Bankr. 2008)...................................................... 6

*In re Rest. Dev. Grp.*, 396 B.R. 717 (N.D. Ill. Bankr. 2008) ......................................................... 10

*In re Roti*, 271 B.R. 281 (N.D. Ill. Bankr. 2002) ........................................................................... 16

*In re Teknek, LLC*, 343 B.R. 850 (N.D. Ill. Bankr. 2006) ............................................................... 6

*Indep. Trust Corp. v. Fidelity Nat'l Title Ins. Co. of N.Y.*,
        577 F. Supp. 2d 1023 (N.D. Ill. 2008) ................................................................................... 15

*Kenendy v. Four Boys Labor Serv., Inc.*, 279 Ill. App. 3d 361 (2d Dist. 1996) .......................... 17

*Laborers' Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602 (7th Cir. 2009) ........................... 5, 7, 13

*Marc Maghsoudi Enters., Inc. v. Tufenkian Import/Export Ventures, Inc.*,
        No. 08 C 441, 2009 WL 3837455 (N.D. Ill. Nov. 16, 2009)..................................................... 5

*Pielet v. Pielet*, 407 Ill. App. 3d 474 (2d Dist. 2011) .................................................................... 19

*Russo v. B&B Catering, Inc.*, 209 F. Supp. 2d 857 (N.D. Ill. 2002) ............................................. 5

*U.S. v. Midwest Generation, LLC*,
        No. 09-cv-5277, 2011 WL 1003916 (N.D. Ill. Mar. 16, 2011) ................................................ 17

*Vernon v. Schuster*, 179 Ill. 2d 338 (Ill. 1997) ............................................................... 17, 18, 20

*Wachovia Secs., LLC v. Jahelka*, 586 F. Supp. 2d 972 (N.D. Ill. 2008).............................. passim

*Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d 834 (N.D. Ill. 2007)................................... 7

**Statutes**

740 ILCS 160/2.................................................................................................... 14, 15

740 ILCS 160/3............................................................................................................ 16

740 ILCS 160/5............................................................................................................ 14

740 ILCS 160/6.................................................................................................... 14, 15

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| CENTERPOINT ENERGY SERVICES, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:10-cv-2121 |
| WR PROPERTY MANAGEMENT, LLC, CAMEEL HALIM, HODA HALIM, THE CAMEEL HALIM LIVING TRUST DATED OCTOBER 24, 1996, and THE HODA HALIM LIVING TRUST DATED OCTOBER 24, 1996, | ) ) ) ) ) ) | Judge Virginia M. Kendall |
| Defendants. | ) ) | |

## CENTERPOINT'S MEMORANDUM IN SUPPORT OF ITS
## MOTION FOR SUMMARY JUDGMENT

This action seeks to hold Defendants Cameel and Hoda Halim, and their company Defendant WR Property Management, LLC ("WR"), liable for debts that the Halims' company Wilmette Real Estate & Management, LLC ("Wilmette") incurred by failing to pay invoices for natural gas provided by CES. CES filed suit in the Circuit Court of Cook County and the court entered final judgment against Wilmette for approximately $1.7 million on December 7, 2009. CES has been unable to collect its judgment because the Halims transferred over $10 million from Wilmette to themselves, moved Wilmette's remaining assets and business to WR (a new company they created to succeed Wilmette), and then closed Wilmette's bank accounts and shut down its business. CES is entitled to summary judgment because the undisputed facts show that (1) the Halims are the alter ego of Wilmette; (2) the Halims fraudulently transferred over $10 million of Wilmette's assets to themselves; and (3) WR is the successor to Wilmette. Accordingly, the Court should grant summary judgment on CES' claims for alter ego, fraudulent transfer, and successor liability.

207165_8.DOC

## FACTUAL BACKGROUND

**A.    The Halims Own Wilmette And Over 40 Other Companies.**

Defendants Cameel Halim and Hoda Halim (collectively, the "Halims") own, through their living trusts, Wilmette, a company they use to manage over 41 real estate properties in the Chicago area.  (CES' Local Rule 56.1 Statement of Uncontested Material Facts ("SOF") ¶ 4.)  The Halims never put any capital in Wilmette when it was organized on December 28, 2004, or at any time thereafter.  (SOF ¶ 11.)  Since its inception, Wilmette has reported a negative net income every year and its expenses have exceeded its income every month from 2006 through 2008, with the exception of a single month in October 2008.  (SOF ¶ 21.)

In addition to the 41 real estate properties, the Halims own a number of other companies such as an office building, two private boats, three restaurants, a clock museum, and a number of private residential buildings.  (SOF ¶ 9.)  The 41 properties and the Halims' other companies are all separately organized as limited liability companies owned by the Halims. (SOF ¶ 9.)  With the limited exception of the Halims' restaurants, all of the Halims' companies use Wilmette's address, phone number, and contact information, and use Wilmette's bank accounts to pay their expenses.  (SOF ¶ 9.)

**B.    The Halims Use Wilmette's "Trust" Account To Run Nearly All Their Businesses.**

The Halims refer to Wilmette's bank accounts as "trust" accounts (collectively, the purported " 'Trust' Account") because they hold money for all of the Halims' various companies.  Yet, no written trust agreement exists between Wilmette and the Halims' other companies and the accounts are set up with the bank as Wilmette's accounts—*not* "trust" accounts.  There is thus no agreement with the bank restricting or regulating Wilmette's use of

funds in the "Trust" Account. (SOF ¶¶ 23, 24.) The "Trust" Account contains money received by Wilmette as management fees from the Halims' properties, rental income collected by the properties, credit fees received by prospective tenants, and the Halims' own "personal" funds. (SOF ¶ 26.) The money in the "Trust" Account is kept as "[o]ne lump sum" and Wilmette's bank statements do not reflect how much cash each company may have within the "Trust" Account. (SOF ¶ 27.)

   The Halims claim that Wilmette had oral management agreements with each of the Halims' properties—purportedly negotiated by the Halims on all sides—under which Wilmette agreed to manage the properties and their finances. (SOF ¶ 17.) Because the Halims' properties do not have any bank accounts, Wilmette enters into contracts with vendors for services and other expenses of the properties and all bills and expenses for the properties are kept in Wilmette's name. (SOF ¶ 25.) Furthermore, the Halims' use Wilmette's employees to process transactions and pay expenses for their companies other than Wilmette. (SOF ¶ 39.)

**C.**  **The Halims Deposit And Withdraw Money From Wilmette's "Trust" Account To Keep It At A "Zero Balance."**

   When the "Trust" Account does not have enough money to meet the expenses of the Halims' companies, the Halims deposit additional money into the account. (SOF ¶ 14.) Because any of the Halims' companies can use the "Trust" Account to pay their expenses, it is "impossible" to determine which company may have used the money deposited by the Halims. (SOF ¶ 29.) The Halims claim that their deposits into the "Trust" Account are "loans" to keep Wilmette and the Halims' other companies "running in business." (SOF ¶ 14.) None of these purported loans are evidenced by a written document or note, contain any terms, bear any interest, or have any repayment date. (SOF ¶ 15.)

The Halims admitted that they try to keep the "Trust" Account at a "zero balance" and take withdrawals from the "Trust" Account when it has "excess" money. (SOF ¶ 28.) From 2005 through 2008, the Halims withdrew over $10 million from Wilmette's "Trust" Account. (SOF ¶ 30.) The Halims claim that their withdrawals were repayments of "loans." (SOF ¶ 28.)

In October 2008, the only month that Wilmette reported a positive net income, the Halims' properties "reimbursed" Wilmette $1.22 million for gas that CES provided to the properties and Wilmette recorded the money it received as income from a "Gas Sale." (SOF ¶ 22.) The Halims admitted that they executed this transaction specifically to keep their properties out of the dispute with CES. (SOF ¶ 22.) The same month, the Halims wrote two checks from Wilmette to themselves totaling $1.2 million. (SOF ¶ 30.)

### D. After CES Filed Suit, The Halims Transferred Wilmette's Business To A New Company And Shut Down Wilmette.

On June 11, 2008, CES filed suit against Wilmette for breach of their gas agreement and, following summary judgment, the Circuit Court of Cook County entered a final judgment against Wilmette in the amount of $1,678,499.16, including interest, attorneys' fees, and costs.[1] (SOF ¶ 45.) On July 1, 2008, less than a month after CES filed its lawsuit against Wilmette, the Halims created a new company, WR, to take over Wilmette's business. (SOF ¶ 47.) The Halims transferred all of Wilmette's bank accounts, employees, office space, management agreements, and other assets to WR. (SOF ¶¶ 48, 49, 52, 53.) Wilmette also executed an Assignment of Leases to expressly assign all of Wilmette's "rights and obligations

---

[1] After entry of summary judgment, CES filed a motion for determination of interest and attorneys' fees. (SOF ¶ 45.) In that motion, CES reserved the right to seek additional late charges, attorneys' fees, and costs "as they accrue through post-judgment proceedings." (SOF ¶ 45.) The Circuit Court granted CES' motion and entered final judgment against Wilmette. (SOF ¶ 46.)

as managing agent for the properties" to WR. (SOF ¶ 54.) The Halims then closed Wilmette's

bank accounts and shut down Wilmette. (SOF ¶¶ 56, 59.)

## ARGUMENT

Summary judgment is appropriate where, as here, there are no genuine issues of

material fact and the moving party is entitled to judgment as a matter of law. *Russo v. B&B*

*Catering, Inc.*, 209 F. Supp. 2d 857, 859 (N.D. Ill. 2002). While the Court views admissible

evidence in the light most favorable to the non-moving party, this does not mean there must be

absolutely no evidence supporting the non-moving party, but rather that there is not enough to

support a reasonable jury verdict. *Id*.

## I. THE UNDISPUTED FACTS SHOW THAT THE HALIMS ARE WILMETTE'S ALTER EGO.

Where an individual uses a company merely as an instrumentality to conduct that

person's business, the corporate veil of limited liability may be "pierced" and the individual held

liable for the underlying cause of action. *Wachovia Secs., LLC v. Jahelka*, 586 F. Supp. 2d 972,

990 (N.D. Ill. 2008). Piercing the corporate veil is an equitable remedy designed to prevent

those who fail to respect a corporation's separate legal existence from hiding behind the

corporation to avoid liability for their wrongdoing. *Id*. Where, as here, the material facts are not

in dispute, the decision whether to disregard the corporate form to impose liability may be

resolved on summary judgment. *Laborers' Pension Fund v. Lay-Com, Inc.,* 580 F.3d 602, 610

(7th Cir. 2009) (affirming district court's summary judgment on veil-piercing claims).

"Illinois courts have consistently held that though the traditional structure of an

LLC prevents personal liability of members absent an agreement, it does not bar personal

liability for the purpose of veil piercing." *Marc Maghsoudi Enters., Inc. v. Tufenkian*

*Import/Export Ventures, Inc.*, No. 08 C 441, 2009 WL 3837455, at *4 (N.D. Ill. Nov. 16, 2009);

*see also Flentye v. Kathrein*, 485 F. Supp. 2d 903, 912 (N.D. Ill. 2007) (finding plaintiffs could rely on veil piercing theory even if defendant is a limited liability company, rather than a corporation); *In re Polo Builders, Inc.*, 388 B.R. 338, 384 (N.D. Ill. Bankr. 2008) (Illinois courts have held that a LLC's members can be personally liable for acts of a LLC if similar grounds exist that have traditionally been used to pierce the veil of corporations); *In re Teknek, LLC*, 343 B.R. 850, 863 n.6 (N.D. Ill. Bankr. 2006) ("Limited liability companies may be subjected to veil-piercing actions in a way similar to the way corporations are deemed alter egos of their shareholders.").

A party seeking to pierce the corporate veil must demonstrate that (1) there is such unity of interest and ownership between the individual and the corporation that the separate personalities of the corporation and the individual no longer exist; and (2) the circumstances are such that adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Jahelka*, 586 F. Supp. 2d at 990-91. Here, the undisputed facts show that instead of treating Wilmette as a separate and independent entity, the Halims used Wilmette to conduct their personal business and the business of their other companies. Accordingly, the Court should pierce the veil of Wilmette to reach its members, Cameel and Hoda Halim.

**A.    The Unity Of Interest Factors Favor Piercing Wilmette's Veil To Reach The Halims.**

In determining whether there is a unity of interest such that the corporate form should be disregarded, some factors courts consider are: (1) inadequate capitalization; (2) insolvency of the debtor corporation; (3) failure to observe corporate formalities; (4) commingling of funds; (5) diversion of assets from the company to its members; (6) failure to maintain arm's length relationships; and (7) whether the company is a mere façade for the operation of its members. *Jahelka*, 586 F. Supp. 2d at 991 (identifying veil-piercing factors).

The court must decide whether the factors, taken as a whole, demonstrate that the company is actually the alter ego of the individual. *Id.*

### 1. The Halims Never Capitalized Wilmette.

Undercapitalization is primarily concerned with "paid-in" capital, describing the investment made by members at the establishment of the company. *Lay-Com, Inc.*, 508 F.3d at 612 (distinguishing liquid assets such as cash and accounts receivables from unencumbered or "paid-in" equity capital). Absent adequate capitalization, a company becomes a mere liability shield rather than an independent entity capable of carrying on its own business. *Wachovia Secs., LLC v. Neuhauser*, 528 F. Supp. 2d 834, 855 (N.D. Ill. 2007); *Lay-Com, Inc.*, 580 F.3d at 612 ("Shareholders are generally expected to invest *some* money, that is, if they want the benefit of limited liability.") (emphasis in original).

Here, the Halims admitted that they never put any paid-in capital into Wilmette at the time of its organization, or at any time thereafter. (SOF ¶ 11.) Rather, Wilmette testified that it "doesn't need [] capital" because the Halims supplied loans to Wilmette to keep it in business. (SOF ¶ 14.) Although Wilmette reported "capital contributions" on its tax returns, Wilmette's tax attorney admitted that he "arbitrarily" made up these numbers and that his only considerations were to pick a number that was "positive" and "round." (SOF ¶ 13.) He conceded that he never reviewed any of Wilmette's bank statements to determine whether capital contributions were ever actually made to Wilmette. (SOF ¶ 13.)

The undisputed facts thus show that Wilmette lacked any unencumbered paid-in capital and was entirely dependent on "loans" from the Halims to pay expenses and stay in business. *See Lay-Com, Inc.*, 580 F.3d at 614 (7th Cir. 2009) (company needing a steady influx of cash loans to keep going is a hallmark of undercapitalization). Accordingly, there is no genuine issue of fact that Wilmette was not only undercapitalized, it had *no* capital whatsoever.

2.      **The Halims Shut Down Wilmette In 2008 And Left Wilmette Insolvent.**

The undisputed facts show that the Halims shut down Wilmette's business at the end of 2008, closed Wilmette's bank accounts, and left Wilmette insolvent and unable to pay its outstanding obligation to CES. *See Jahelka*, 586 F. Supp. 2d at 1003 (finding company insolvent where defendants could present no evidence regarding the company's present financial status or solvency). The Halims transferred all of Wilmette's employees, assets, and management agreements to WR and closed Wilmette's bank accounts. (SOF ¶ 53.) Wilmette filed its final tax return in 2008 and has not generated any income since the end of 2008. (SOF ¶¶ 56, 59.) There is no dispute that Wilmette is presently insolvent and has been insolvent throughout its existence.

3.      **The Halims Ignored Their Obligations Under Wilmette's Operating Agreement.**

Although Wilmette purported to have an Operating Agreement, the Halims disregarded its existence. For example, while Wilmette's Operating Agreement requires that its members make capital contributions to Wilmette as of the effective date of the agreement, December 28, 2004, the Halims admitted that they did not make any capital contributions on that date or at anytime thereafter. (SOF ¶ 11.) Nor did Wilmette maintain capital accounts for its members as required by the Operating Agreement. (SOF ¶ 12.) The Operating Agreement further requires that if a member provides loans to Wilmette, the loans "shall bear interest quarterly" and notice shall be sent to each member that Wilmette requires additional funding. (SOF ¶ 15.) Although the Halims claimed they made numerous "loans" to Wilmette, none of the loans had any written promissory note, terms, interest, or even a repayment date. (SOF ¶ 15.)

**4. The Halims Commingled Wilmette's Funds With Funds From Their Other Companies And Their "Personal" Funds.**

The undisputed facts show that the Halims commingled Wilmette's money with the money for over 40 different other companies owned by the Halims and their own personal funds. (SOF ¶¶ 9, 27, 26, 29.) The Wilmette "Trust" Account kept money received by Wilmette as management fees, rental income collected by the Halims' properties, credit fees from prospective tenants, and the Halims' own personal funds—all commingled together in "[o]ne lump sum." (SOF ¶¶ 26, 27.) Wilmette admitted that its bank statements do not reflect or track how much money in the "Trust" Account belongs to each entity. (SOF ¶ 27.) Any of the over 40 Halim companies using Wilmette's "Trust" Account could use any of the money in the account to pay their expenses. (SOF ¶ 29.)

Although Wilmette claims that it internally "tracked" the income and expenses of each entity, the Halims admitted that Wilmette's books are "not that strict accounting" and that the Halims "audit" and "correct" the books to change how expense transactions are reflected and to which company they will be allocated. (SOF ¶¶ 32, 33.) Just for 2008, Wilmette has produced three different sets of "books" which purport to reflect Wilmette's financial transactions for the same period. (SOF ¶ 34.)

Moreover, Wilmette's tax returns do not match its financial reporting. (SOF ¶ 36.) For example, although Wilmette's tax return in 2005 reported $60,000 in rent expenses, Wilmette's financial reports show only $24,000 in expenses. (SOF ¶ 36.) Wilmette's tax attorney could not explain the inconsistency, admitting that he reported $60,000 in rent expenses on Wilmette's tax returns simply because Mr. Halim told him to do so. (SOF ¶ 36.)

There is thus no genuine dispute of fact that the Halims commingled their funds with the funds of Wilmette and the Halims' other companies, and that any attempt to internally

track the funds is unreliable and entirely controlled by the Halims.

**5.      The Halims Diverted Over $10 Million From Wilmette To Themselves Over The Course Of Four Years.**

The undisputed facts show that from 2005 through 2008, the Halims transferred over $10 million from Wilmette's "Trust" Account to themselves.  (SOF ¶ 30.)  The Halims claim that these withdrawals were repayments of "loans," but cannot identify any specific loan, the amount of the loan, or even the company paying back the loan.  (SOF ¶ 29.)  *See Automotive Fin. Corp. v. Joliet Motors, Inc.*, 761 F. Supp. 2d 789, 793-94 (N.D. Ill. 2011) (finding alter ego factor satisfied where purported loans were not evidenced by any agreements concerning the terms of the loans).  Moreover, even assuming that any of the Halims' transfers from Wilmette actually was a "repayment" of a loan, the Halims' decision to pay themselves back before paying Wilmette's outstanding obligations to CES and other creditors demonstrates that the Halims failed to maintain any semblance of arms-length relationships.  *See Jahelka*, 586 F. Supp. 2d at 1006 (finding alter-ego liability where defendants chose to pay back loans from insiders rather than pay third-party creditors).

**6.      The Halims Failed To Maintain Arms-Length Relationships Between Wilmette And Their Other Companies.**

Wilmette's key transactions were all characterized by a failure to maintain arms-length relationships between Wilmette and the Halims' other companies.  The undisputed facts show that almost every agreement involving Wilmette was negotiated by the Halims on all sides, was "oral," and lacked any written documentation or terms.  *See In re Rest. Dev. Grp.*, 396 B.R. 717, 728 (N.D. Ill. Bankr. 2008) (noting that termination agreement executed by defendant on behalf of all parties was not made at arms-length and thus failed to provide independent factual support for defendant's claim that oral management contracts had been terminated).

Although Wilmette's business was to manage the Halims' properties, Wilmette had no written management agreements with any of the properties. (SOF ¶ 17.) Instead, the Halims claim that Wilmette had "oral" management agreements, negotiated by the Halims on behalf of all parties, which defined Wilmette's obligations and established the management fees that constituted the majority of Wilmette's income. (SOF ¶ 17.) Wilmette also "orally" leased its office space from another Halim company, again with all the terms and rent negotiated by the Halims on behalf of all parties. (SOF ¶ 19.)

Wilmette purportedly holds money for all of the Halims' properties in its "Trust" Account, enters into contracts with vendors and purchases services and items for the properties, and pays expenses for the buildings using money in its "Trust" Account. (SOF ¶ 25.) Yet, no written trust agreement exists between Wilmette and any other company using the "Trust" Account and the accounts are set up with the bank as Wilmette's accounts—not "trust" accounts. (SOF ¶ 24.) Moreover, the Halims purport to have entered into numerous "loan" transactions to fund the "Trust" Account with additional money to pay expenses, but none of the purported loans were evidence by a written document or note, contained any terms, bore any interest, or had a repayment schedule. (SOF ¶ 15.)

There is simply no genuine dispute of fact that the Halims failed to maintain any arms-length relationships between Wilmette, themselves, and the Halims' other companies.

### 7.    The Halims Used Wilmette As A Mere Façade To Conduct Their Personal Business And The Business Of Their Other Companies.

The undisputed facts show that the Halims used Wilmette as a mere façade to conduct their personal business and the business of their other companies. Nearly all of the Halims' companies use Wilmette's address and Wilmette's phone number as their own. (SOF ¶ 10.) *Jahelka*, 586 F. Supp. 2d at 1007-08 (noting that various companies operated by

11

defendant shared the same office space, phone, and fax numbers).  Moreover, numerous entities, such as the Halims' clock museum, personal boats, personal residences, and restaurants, use Wilmette's "Trust" Account to pay their expenses and use Wilmette's employees to handle matters relating to the entities even though the Halims admitted that these entities have no management agreement with Wilmette.  (SOF ¶¶ 38, 39, 41, 42.)  *See Jahelka*, 586 F. Supp. 2d at 1003-04 (use of company employees to perform tasks unrelated to their employment is evidence of alter-ego liability).

For example, Wilmette's general counsel handles legal work, without separate compensation, for the properties as well as other personal matters for the Halims, including traffic tickets, an insurance coverage case with the Halims' boat, a replevin lawsuit for the return of a violin, and a case involving the Halims' purchase of Faberge eggs at an auction.  (SOF ¶ 40.)  Wilmette's employees likewise routinely process payables and expenses for the Halims' other companies.  (SOF ¶¶ 38, 39.)

Moreover, the Halims use funds from the "Trust" Account to pay for personal expenses and then assign the expenses to other entities.  *See Automotive Fin. Corp.*, 761 F. Supp. 2d at 794 (finding alter-ego where defendant used company to pay personal expenses).  For example, the Halims used Wilmette's "Trust" Account to fund the build-out for their restaurant and assigned the expense to one of their properties, even though Mr. Halim had previously agreed to personally fund the $1 million build-out cost.  (SOF ¶ 42.)  Mr. Halim admitted that there is no distinction between his personal affairs and his businesses: "I have two hats.  I have the building hat, and I have my personal.  And they're the same."  (SOF ¶ 42.)

**B.**     **Failing To Pierce Wilmette's Veil To Reach The Halims Would Sanction A Fraud And An Injustice.**

A plaintiff may show that fraud or injustice will result unless the corporate veil is

12

pierced by showing that defendants will be unjustly enriched or unfairly avoid liability after draining corporate assets. *Jahelka*, 586 F. Supp. 2d at 1012. The Seventh Circuit has noted that a corporate owner who uses several corporations to avoid responsibilities to creditors is adequate justification for piercing the veil of the corporation. *Id.* (citing *Hystro Prods., Inc. v. MNP Corp.*, 18 F.3d 1384, 1390 (7th Cir. 1994)).

Here, the Halims use Wilmette and Wilmette's "Trust" Account to operate over 40 different companies and shield their other companies from liability. (SOF ¶ 9.) The Halims enter into contracts, in Wilmette's name, for their other companies and use Wilmette's "Trust" Account to pay expenses for the companies. (SOF ¶ 26.) By keeping the "Trust" Account at a "zero balance," the Halims ensure that the companies are reliant on funding from the Halims to stay in business. (SOF ¶ 28.) The Halims evade creditors by placing the liabilities for all their businesses in Wilmette's name and then claiming that the money in Wilmette's "Trust" Account belongs to their other companies. *See Lay-Com, Inc.*, 580 F.3d at 614 (keeping assets in a liability-free corporation while placing liabilities on an asset-free corporation is sufficient grounds to pierce the corporate veil).

Moreover, the undisputed facts show that the Halims' and their companies have been unjustly enriched by avoiding payment of CES' $1.7 million judgment for gas that CES provided to the Halims' properties. The Halims have diverted over $10 million from Wilmette and left behind an empty shell. Accordingly, the Court should pierce Wilmette's veil to avoid the fraud and injustice that would result from allowing the Halims' to escape the $1.7 million judgment that entered against Wilmette.

## II. THE UNDISPUTED EVIDENCE SHOWS THAT DEFENDANTS FRAUDULENTLY TRANSFERRED OVER $10 MILLION DOLLARS FROM WILMETTE.

The Uniform Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.* (the "Act")

13

protects against transfers that the law considers fraudulent, even without actual intent to defraud. *Gen. Elec. Cap. Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078-79 (7th Cir. 1997). A plaintiff states a prima facie case of fraud in law under Section 160/5 or Section 160/6 by establishing that the debtor made a transfer (1) without receiving a reasonably equivalent value in exchange for the transfer; and (2) the debtor was insolvent at the time of the transfer, became insolvent as a result of the transfer, or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. *See* 740 ILCS 160/5(a)(2)(B); 740 ILCS 160/6(a). While under Section 160/5 the transfer can occur before or after the plaintiff's claim arose, Section 160/6 requires the plaintiff's claim to arise before the transfer takes place. Here, CES' claim arose at least when Wilmette stopped paying CES' invoices in November 2007. 740 ILCS 160/2(c) (defining claim as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured").

Because the undisputed facts show that the Halims transferred over $10 million from Wilmette to themselves while Wilmette was insolvent and unable to pay its debts, without giving Wilmette anything in return that could satisfy Wilmette's creditors, summary judgment should be granted on CES' fraudulent transfer claims pursuant to Sections 160/5 and 160/6.

### A. The Halims Did Not Provide Wilmette With Anything Of A Reasonably Equivalent Value In Exchange For Their Transfers.

Courts utilize several factors to determine reasonable equivalence, including: (1) whether the value of what was transferred is equal to the value of what was received; (2) the fair market value of what was transferred and what was received; (3) whether the transaction took place at arm's length; and (4) the good faith of the transferee. *Grochocinski v. Schlossberg*, 402 B.R. 825, 836 (N.D. Ill. 2009). A transfer is not made for "reasonably equivalent value" when

the transferee gives no consideration, or too little consideration, for the assets received. *Indep. Trust Corp. v. Fidelity Nat'l Title Ins. Co. of N.Y.*, 577 F. Supp. 2d 1023, 1043 (N.D. Ill. 2008). Since the purpose of fraudulent conveyance law is to protect creditors, the inquiry focuses on what the debtor gave up and what it received that could benefit creditors. *In re Joy Recovery Tech. Corp.*, 286 B.R. 54, 75 (N.D. Ill. Bankr. 2002).

Here, the undisputed facts show that, from 2005 through 2008, the Halims withdrew over $10 million from Wilmette (including $4.04 million after November 2007 when Wilmette stopped paying CES' invoices) without giving Wilmette anything that could benefit its creditors. (SOF ¶ 30.) Wilmette's transfers to the Halims are described in paragraph 30 of CES' statement of facts. (SOF ¶ 30 & Ex. J, at Decl. Ex. 1.) The transfers include $1.22 million that the Halims transferred from Wilmette in October 2008 shortly after the Halims' properties had "reimbursed" Wilmette $1.22 million for gas that CES had provided to the properties. (SOF ¶ 30.)

The Halims' claim that the transfers represent "repayments" of purported Halim loans that the Halims provided Wilmette is without merit because, even if true, the transfers would still be fraudulent under 740 ILCS 160/6(b) which prevents transfers to insiders for antecedent debts while the debtor is insolvent. *See* 740 ILCS 160/2(g) (defining "insider" as a "a managing agent of the debtor"). Moreover, none of the transfers were made at arms-length, and none of the purported loan transactions were documented by a promissory note, or had any terms, interest, or even a repayment date. (SOF ¶ 15.)

The Halims cannot identify to which company the loan was made, how much of the loan is outstanding, or which company is paying back the loan because the funds are commingled together as "[o]ne lump sum." (SOF ¶¶ 26, 27, 29.) The undisputed fact is that

money was withdrawn by the Halims from Wilmette's bank accounts and the Halims cannot tie

it back to any legitimate transaction.  Accordingly, there is no genuine dispute that Wilmette

received nothing of reasonably equivalent value for its transfers of over $10 million to the

Halims.

      **B.**      **Wilmette Was Insolvent At The Time Of The Transfer, Became Insolvent As A Result Of The Transfer, And/Or Knew That It Could Not Pay Its Debts As They Became Due.**

The Act provides that a debtor is insolvent "if the sum of the debtor's debts is

greater than all of the debtor's assets at a fair valuation."  740 ILCS 160/3(a).  "Actual

insolvency is not required."  *In re Roti*, 271 B.R. 281, 304 (N.D. Ill. Bankr. 2002).  A debtor who

is generally not paying his debts as they become due is presumed to be insolvent.  740 ILCS

160/3(b).  The test is whether the conveyance directly tended to, or did impair, rights of existing

creditors.  *Id*.

Wilmette was insolvent throughout its existence, reporting a negative net income

every single month from 2006 through 2008, with the exception of a single month in October

2008, when it purported to receive $1.22 million in additional income from the Halims'

properties for gas that CES had supplied.  (SOF ¶¶ 21, 22.)  And in October 2008, the Halims

withdrew the $1.22 million in purported excess profit from Wilmette.  (SOF ¶ 30.)  Wilmette

further assumed hundreds of thousands of dollars in liabilities each month consisting of expenses

and vendor contracts for purchases and services provided to the Halims' properties that were

entered in Wilmette's name.  (SOF ¶ 25.)  None of these expenses were reported on Wilmette's

financial statements even though Wilmette was the legal obligor on the contracts.  (SOF ¶ 25.)

The Halims admitted that Wilmette could not stay in business or pay its debts

without financial support from the Halims.  (SOF ¶ 14.)  Yet, the Halims continued to transfer

money from Wilmette's "Trust" Account even though they knew that Wilmette was financially

unable to survive independently. Moreover, the Halims knew that Wilmette had incurred debts that it would be unable to pay as a result of the transfers. For example, Mr. Halim admitted that he took withdrawals from Wilmette even though he knew CES had a claim against Wilmette for $1.2 million in outstanding invoices. (SOF ¶ 22.)

There is no genuine dispute that Wilmette was insolvent at the time it made the transfers and that Wilmette received nothing of reasonably equivalent value that it could provide to its creditors to satisfy its outstanding debts. Accordingly, the Court should grant summary judgment on CES' fraudulent transfer claims.

## III.   THE UNDISPUTED FACTS SHOW THAT WR IS THE SUCCESSOR COMPANY OF WILMETTE.

Summary judgment is appropriate on CES' successor liability claim on two independent grounds. First, WR expressly agreed to assume Wilmette's obligations by entering into an express assignment agreement. Second, there is no dispute that WR is the "mere continuation" of Wilmette. *Vernon v. Schuster*, 179 Ill. 2d 338, 345 (Ill. 1997) (identifying exceptions under which corporate successor liability may be established); *see Kenendy v. Four Boys Labor Serv., Inc.*, 279 Ill. App. 3d 361, 367 (2d Dist. 1996) (affirming summary judgment on successor liability claim). Accordingly, the Court should grant summary judgment on CES' successor liability claim.

### A.   WR Expressly Assumed Wilmette's Obligations and Liabilities.

Successor liability will be imposed on a company where there is "an express or implied agreement of assumption." *Hoppa v. Schermerhorn & Co.*, 259 Ill. App. 3d 61, 64 (1st Dist. 1994); *see U.S. v. Midwest Generation, LLC*, No. 09-cv-5277, 2011 WL 1003916, at *10 (N.D. Ill. Mar. 16, 2011). Because WR admits that Wilmette assigned to WR, and WR accepted

17

the assumption of, all of Wilmette's obligations and liabilities, there are no disputed facts and summary judgment should be granted on CES' successor liability claim.

Mr. Halim admits that he executed an Assignment of Leases between Wilmette and WR that stated as follows: [2]

> For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree that, effective as of the date hereof, Wilmette Real Estate & Management Company, LLC assigns all its rights and obligations as managing agent for the properties set out in the attached Exhibit A to WR Property Management, LLC.

(SOF ¶ 54.) Mr. Halim admitted that the rights and obligations that Wilmette transferred to WR included the obligation to "pay the expenses."[3] (SOF ¶ 54.)

Indeed, following the closing of Wilmette's bank accounts, approximately $2.1 million in outstanding Wilmette debts were delivered to WR and WR paid the debts for Wilmette. (SOF ¶ 58.) With the exception of Wilmette's outstanding obligation to CES, WR acted in total accordance with its express assumption of Wilmette's liabilities. Because there is no dispute of fact that WR expressly assumed Wilmette's obligations, which included the outstanding debt owed to CES, the Court should grant summary judgment on CES' successor liability claim.

**B.      WR Is The Mere Continuation Of Wilmette.**

The mere continuation exception to the rule of successor corporate nonliability applies to hold a successor corporation liable where the corporation is merely a continuation or reincarnation of the previous corporation. *Vernon*, 179 Ill. 2d at 346; *In re H. King & Assocs.*,

---

[2] As the manager of both Wilmette and WR, Mr. Halim signed the assignment twice, on behalf of both parties. (SOF ¶ 54.)

[3] The general counsel for Wilmette and WR, who Mr. Halim originally asked to draft the assignment, testified directly that he believes WR is the successor company to Wilmette. (SOF ¶ 54.)

18

295 B.R. 246, 278-79 (N.D. Ill. Bankr. 2003). "In other words, the purchasing corporation maintains the same or similar management and ownership, but merely 'wears different clothes.'" *Id*. Although the aim of the mere-continuation exception is to prevent fraud, "the exception does not require specific proof of an intent to defraud creditors." *Pielet v. Pielet*, 407 Ill. App. 3d 474, 509 (2d Dist. 2011) (finding it "immaterial" that nothing in the record demonstrates that defendant had the specific purpose of placing assets out of reach).

　　　　Wilmette's change to WR constituted a mere change in name, without any significant change in substance.[4] Wilmette testified that all of Wilmette's employees "[a]utomatically" became employees of WR. (SOF ¶ 49.) The Halims orally "transferred" Wilmette's management agreements to WR. (SOF ¶ 48.) WR "took" Wilmette's office space and Wilmette's computers, furniture, and office equipment. (SOF ¶ 52.) WR uses Wilmette's same telephone number and internet address. (SOF ¶52.) Wilmette's employees admitted that their job responsibilities did not change after the switch and they were merely told to get new letterhead and business cards. (SOF ¶ 50.) Mrs. Halim, who owned Wilmette and WR with Mr. Halim, admitted that Wilmette and WR are "the same thing," that the difference is just a "label," and that "nothing changed." (SOF ¶ 51.)

　　　　WR merely continued Wilmette's business as it had previously operated using Wilmette's office space, assets, employees, and agreements. (SOF ¶¶ 48, 49, 52, 53.) *See Hoppa*, 259 Ill. App. 3d at 66 (finding successor liability where "two companies conducted business from the same address using the same telephone number; managed the same property;

---

[4] It is undisputed that both Wilmette and WR are owned by Cameel and Hoda Halim's respective living trusts, and through the trusts, by Cameel and Hoda Halim individually. (SOF ¶¶ 3, 4.) *Pielet*, 407 Ill. App. 3d at 509-10 (affirming summary judgment where the uncontested facts showed "continuity of ownership" from the predecessor corporation to the successor corporation).

19

employed the same staff; and maintained the same bank accounts"). Following the transfer of business to WR, the Halims closed Wilmette's bank accounts and ended Wilmette's operations. (SOF ¶ 53.) Wilmette has not paid any bills, filed any tax returns, kept any financial statements, or generated any income since the end of 2008. (SOF ¶¶ 56, 59.)

The undisputed facts show that the Halims created WR less than a month after CES filed suit, transferred all of Wilmette's business to WR, and then closed Wilmette's bank accounts and shut down its business. Summary judgment should enter because Wilmette cannot escape liability through its mere change in name. *Brandon v Anesthesia & Pain Mgmt. Assocs., Ltd.*, 419 F.3d 594, 599 (7th Cir. 2005). ("[I]f a corporation goes through a mere change in form without a significant change in substance, it should not be allowed to escape liability.") (quoting *Vernon*, 179 Ill. 2d at 346).

## CONCLUSION

For the reasons stated above, CES respectfully requests that the Court enter summary judgment in its favor and against Defendant on CES' claims for fraudulent transfer, successor liability, and alter ego claims, and grant the relief requested in CES' separately-filed Motion for Summary Judgment.

Dated: July 20, 2011                                Respectfully submitted,


                                                   /s/ Robert J. Palmersheim
                                                   One of the attorneys for Plaintiff CenterPoint
                                                   Energy Services, Inc.

Steven A. Weiss
Robert J. Palmersheim
Lesley G. Smith
Anand C. Mathew
SCHOPF & WEISS LLP
One South Wacker Drive, 28th Floor
Chicago, Illinois 60606
312.701.9300