IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| CENTERPOINT ENEGERY SERVICES, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) | Case No. 10 C 2121 |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| WR PROPERTY MANAGEMENT, LLC, CAMEEL HALIM, HODA HALIM, THE CAMEEL HALIM LIVING TRUST DATED OCTOBER 24, 1996, and THE HODA HALIM LIVING TRUST DATED OCTOBER 24, 1996, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION AND ORDER

This case reflects the efforts of CenterPoint Energy Services, Inc. ("CES") to collect

a judgment obtained against Wilmette Real Estate & Management LLC ("Wilmette") for

approximately $1.7 million in the Circuit Court of Cook County on December 7, 2009.  The

debt arose from Wilmette's failure to pay its invoices for natural gas that CES supplied to

the rental properties managed by Wilmette.   In this suit, CES alleges that Wilmette

fraudulently transferred its assets to the Defendants for the purpose of avoiding the

judgment debt in violation of Illinois's Uniform Fraudulent Transfer Act ("UFTA").  CES

names the following as Defendants: Cameel Halim ("Halim") and Hoda Halim ("Mrs.

1

Halim"), the Cameel Halim Living Trust and the Hoda Halim Living Trust ("the Living Trusts"), as well as their company Defendant WR Property Management LLC ("WR"). To that end, CES requests that the Court declare that the Halims are Wilmette's alter ego and that WR is the successor company of Wilmette, execute avoidance or attachment of the fraudulent transfers, and order levy execution of the proceeds of the fraudulent transfers, as well as attorneys' fees and costs and interest.

Before the Court is CES's motion for summary judgment on its claims of fraudulent transfer (Count I), successor liability (Count II) and alter ego liability (Count III). Also before the Court is Defendants' motion for summary judgment on the claim of fraudulent transfer (Count I) and alter ego liability (Count III). Defendants argue that the transfers were not fraudulent because the funds were drawn from the Halims' personal accounts rather than Wilmette's account. In addition, Defendants argue that CES, as a voluntary creditor, cannot complain of an "injustice" to pierce a debtor's corporate veil, if it knew or could have found out that Wilmette lacked sufficient assets to be able to pay the debt when it comes due. For the following reasons, the Court grants CES's motion with regard to Counts I and II, rendering Count III moot. Accordingly, the Court denies Defendants' motion with regard to Count I and III.

## I.     JURISDICTION

This Court has diversity jurisdiction over this action pursuant to 28 U.S.C §1332 because the matter in controversy exceeds $75,000, exclusive of interests and costs, and is between citizens of different states.   This Court has personal jurisdiction over the Defendants because they are citizens of the State of Illinois and conduct business in the State of Illinois.

## II.     MATERIAL FACTS

Both Wilmette and WR are Illinois limited liability companies organized pursuant to the Illinois Limited Liability Company Act, 805 ICLS 1801/1-1 et seq.  (Pltf. Resp. ¶2-3). Wilmette's only members are the Cameel Halim Living Trust and the Hoda Halim Living Trust, which have Halim and Mrs. Halim as their trustees and beneficiaries, respectively. (Pltf. SOF ¶8, 3-4).  The Halims also directly or indirectly own 41 rental properties, an office building, two private boats, four restaurants, an entity that will be a clock museum and a number of private residential buildings.  (Def. Resp. ¶9).  All the companies, including Wilmette, are limited liability companies whose members are Halim and/or Mrs. Halim or their respective living trusts, and for whom the controlling member and manager is Halim; all use the same phone number and address.  (Def. Resp. ¶9).  None of the Halims' companies, other than the restaurants, have their own bank accounts.  (Def. Resp. ¶9). Instead, the forty-or-so companies' funds are collectively held in an account as "[o]ne lump

sum" along with the Halims' personal expenses, as to which Halim testified. (Def. Resp. ¶27). Defendants assert that the "cash management system" means that expenses are only logged when paid but that each company has its own "section" within the account. (Def. Resp. ¶25). However, Wilmette's internal accounting system does not maintain a "strict accounting" of the balances for each company, so the financial statements cannot attest to how much cash is actually available to each company. (Def. Resp. ¶27). The Halims refer to Wilmette's accounts as "trust accounts" or the "Trust Account" however no written trust agreement exists between Wilmette and any of the Halims' other companies that use the Account; no trust agreement exists Wilmette and its bank referring to the account as a trust, regulating or restricting the use of money, or segregating money, amongst the various entities using the Account. (Def. Resp. ¶24). Defendants deny that the Account is in Wilmette's name alone, and instead assert that Wilmette never had its own bank account, but instead a section within the Account. (Def. Resp. ¶24). The evidence submitted proves otherwise—the title holder of the bank account was "Wilmette Real Estate Management Co. LLC" and the checks drawn from the account were issued by the same to the personal "Halim Account" and others. (Doc. 104-6, Exs. A-F).

Wilmette's primary business is managing the Halims' rental properties; CES claims that Wilmette also processes the financial transactions for all of the Halims' limited liability companies but Defendants characterize Wilmette's processing of financial transactions of

the non-building companies as *de minimis*. (Def. Resp. ¶10). Because the rental properties do not maintain their own bank accounts, Wilmette enters into contracts with vendors for services, along with other purchases for the Halims' properties, and all of the bills are kept in Wilmette's name. (Def. Resp. ¶25). Defendants do not dispute that the Account contains funds received by Wilmette as management fees from the rental properties, rental income collected by those rental properties, and credit fees received from prospective tenants. (Def. Resp. ¶26).

In September 2006, CES was providing natural gas to the apartment buildings managed by Wilmette.[1] CES's supplying of gas was pursuant to an agreement between CES and Wilmette, which stated that if Wilmette "fails to pay the amounts when due, [CES] may collect from [Wilmette], in accordance with applicable law, a late charge equal to the lessor of one and one-half percent of the outstanding balance per month or the maximum interest rate allowed by law," which was 18% per annum under Texas law, which governs the Agreement. (Def. Resp ¶43). In the agreement, Wilmette represents through Halim's signature that Wilmette was "financially able to continue in business, unaware of any situation which would alter its financial abilities and has not filed, planned to file or have

---

[1] The Energy Services Agreement from 2006 is considered the second by both CES and Defendants; they are in dispute as to the first. Defendants present an Energy Services Agreement that is not signed by either CES or Wilmette, with its initial term set to begin on June 1, 2005, but CES argues that this is not the agreement at issue in this suit or the underlying State Court suit and disputes that the agreement was entered in 2005. CES Resp. 13. This Court finds that the undated un-executed document has not been authenticated by either party, is inadmissible and stricken.

had [sic] filed any bankruptcy proceeding." (Pltf. SOAF ¶1). A dispute arose in November 2007, though CES continued until February 2008 to deliver natural gas and send bills to Wilmette in a total sum of approximately $1.2 million, which Wilmette failed to pay. (Pltf. Resp. ¶ 19-21). On June 11, 2008, CES filed suit against Wilmette for breach of the energy services agreement in the Circuit Court of Cook County ("State Court"). (Pltf. SOF ¶45). The State Court granted summary judgment to CES on August 19, 2009, and final judgment for additional late charges, attorneys' fees and costs on December 7, 2009, in the amount of $1.7 million. (Def. Resp. ¶46).

On July 1, 2008, less than one month after CES had filed suit, the Halims created a new limited liability company called WR to which they transferred all of Wilmette's management agreements, office equipment, employees and other assets. (Plt. SOF ¶49, 52, 54).[2] Wilmette executed an Assignment of Leases that expressly assigned all of Wilmette's "rights and obligations as managing agent for the properties" to WR. (Pltf. SOF ¶54). Defendants also transferred the entire balance from Wilmette's bank accounts to WR's bank accounts. (Pltf. SOF ¶ 53, 56, 59).

Halim testified that commodity bills were paid by Wilmette in either of two ways: either the bill was directly paid from the buildings' "section" within the Trust Account to the gas

---

[2] The LLC File Detail Report attesting to the incorporation of WR Property Management LLC states its incorporation date as June 27, 2008, though CES and Defendants cite its incorporation date as July 1, 2008. (Doc 99-1).

company, or the bill was indirectly paid when the buildings' section paid Wilmette who then paid the gas company. (Doc. 85-13, Ex. M, January 11, 2011 Deposition of Cameel Halim, p. 212-214). These buildings are purportedly categorized as either Division I or Division II, but Halim testified that money is freely transferred between Division I, Division II, and the supply account; how the transfers are treated on the books "means nothing" and "the final result is the same." (Halim Dep. p. 216, 235). If at the end of the year, there was a positive balance in an account, it was considered a profit. (Halim Dep. p. 244).

However, there was rarely a profit at the end of the year, as Wilmette reported a negative net income every year it was in existence except for 2008, as follows: net loss of $247,500 in 2005, net loss of $775,889 in 2006, $498,980 in 2007. (Def. Resp. ¶21). Halim testified that he tried to keep the "Trust" Account at a "zero balance," so that whenever the account had insufficient funds to pay the expenses of a property under management, he would deposit funds into their "Personal Account Section" of the "Trust" Account, and when the managed properties had sufficient funds, the excess funds would be deducted to return to "zero balance." (Def. Resp. ¶28).

In October 2008, the only month in 2008 when income exceeded expenses, the buildings paid $1.22 million for the natural gas that CES had provided to those properties. The $1.22 million was logged in the Division I and Division II accounts. Divisions I and II paid $1.22 million to the supply account, which was then paid as income to Wilmette and logged as

a "Gas Sale" transaction. (Halim Dep. p. 237). The $1.22 million was then deposited back into Division I. (Halim Dep. p. 246). Halim wrote two checks from the Division I account—one for $1 million and the other for $220,000—to his personal bank account. (Halim Dep. p. 238-239). Halim testified at his deposition that he and his wife executed the transaction in anticipation of ending Wilmette and beginning WR, specifically to keep the Halims' properties out of the dispute with CES regarding the unpaid gas invoices. (Def. Resp. ¶22). By the time the Circuit Court of Cook County entered final judgment against Wilmette for approximately $1.7 million on December 7, 2009, there was nothing left in the Wilmette account for CES to collect.[3]

III.    **Standard**

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

---

[3] In dispute is a Dun & Bradstreet Credit Report on Wilmette: on what date CES obtained the Report, what information it contains, the meaning of the script writing in the margin, and whether it is admissible. (Def. SOF, Tab 13, p. 51). Defendants claim that Wilmette obtained the Report on September 17, 2007, which CES disputes because the "print date" does not establish CES's knowledge of it. (Pltf. Resp. ¶ 29). Defendants claim that because the Report was produced by CES to Wilmette, it is admissible to show CES's knowledge or at least to show CES's state of mind before the sale of gas in November 2007. Defendants point to the hand-written note on the Report that CES's "exposure" is close to $850,000 and financials were needed, and attributes the notes to an unnamed CES employee. CES provides deposition testimony from its employees that they first saw the Report only after the lawsuit was filed, and that they cannot identify whose handwriting appears. (Pltf. SOAF ¶4). CES also provides an affidavit from a Dun & Bradstreet employee, who explains that the Report does not provide any financial statement information regarding Wilmette, only that the total amount of Wilmette's assets and liabilities were unknown at the time the Report was prepared. (Doc. 104-3). The Court finds that the Report raises a question of fact which is immaterial to the analysis of Wilmette's alleged fraudulent transfers and successor liability.

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In determining whether a genuine issue of material fact exists, the Court must view the

evidence and draw all reasonable inferences in favor of the party opposing the motion. *See*

*Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, the Court may "limit its analysis of the facts

on summary judgment to evidence that is properly identified and supported in the parties'

[Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th

Cir. 2000). Where a proposed statement of fact is supported by the record and not

adequately rebutted, the court will accept that statement as true for purposes of summary

judgment. An adequate rebuttal requires a citation to specific support in the record; an

unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th

Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56

demands something more specific than the bald assertion of the general truth of a

particular matter[;] rather it requires affidavits that cite specific concrete facts establishing

the existence of the truth of the matter asserted.'"). Defendants, as the party opposing the

motion for summary judgment on the alleged fraudulent transfer and successor liability,

"get[] the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co.,*

LLC, 636 F.3d 312, 314 (7th Cir. 2011).

IV.    **Discussion**

A.   **CES's claim under the Illinois Uniform Fraudulent Transfer Act**

CES seeks remedies available to it under Section 160/5(a)(2)(B) and Section 160/6(a) of the UFTA. The UFTA indicates two types of fraudulent transfers: actual fraud and constructive fraud. 740 ILCS § 160; *Bay State Milling Co. v. Martin*, 145 B.R. 933, 946 (Bankr. N.D. Ill. 1992). Actual fraud or "fraud-in-fact" results where the "debtor transfers property with the intent to hinder, delay, or defraud his creditors" *Id.*   CES pursues its claim as constructive fraud which, in contrast, is presumed to have occurred under Illinois law when: 1) the debtor made a voluntary transfer; 2) at the time of the transfer, the debtor had incurred obligations elsewhere; 3) the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer; and 4) after the transfer, the debtor failed to retain sufficient property to pay the indebtedness.  *GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. Ill. 1997) (citing *In re Martin*, 145 B.R. at 945); *see* 740 ILCS §160/5(a)(2)(A) & (B).   Establishing fraud in law does not require proof of actual intent to defraud.  *Id.*; *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995). Rather, transfers made for less than reasonably equivalent value, leaving a debtor unable to meet its obligations, are deemed or presumed to be fraudulent. *In re Zeigler*, 320 B.R. 362, 374 (Bankr. N.D. Ill. 2005). Whether "reasonably equivalent value" has been given is typically

a question of fact. *Id.* CES need only prove constructive fraud by a preponderance of the evidence. *See in re Martin*, 145 B.R. at 946.

In this case, CES points to the numerous withdrawals made by the Halims from Wilmette, totaling $10 million from 2005 to 2008. (Pltf. SOF ¶30). Defendants dispute that these transfers constituted withdrawals, preferring to characterize them as reimbursements from Wilmette to the Halims for loans. (Def. Resp. ¶28). Yet none of these purported loans were ever evidenced by a written document or note, accompanied by terms or repayment date, or bore any interest. This method of business operations is in direct contradiction with the Wilmette Operating Agreement that requires that any member loan given to Wilmette "shall bear interest quarterly" at a rate negotiated at the time of the loan. (Def. Resp. ¶ 15). Further, Halim testified that he tried to keep the "Trust" Account at a "zero balance" at all times, so that whenever the account had insufficient funds to pay the expenses of a property under management, he would deposit funds into their "Personal Account Section" of the Account, and when the managed properties had sufficient funds, the excess funds would be deducted. (Def. Resp. ¶28). Even when viewing the facts in the light most favorable to the Halims, a reasonable jury would understand that the "excess" funds that Halim transferred out of the Wilmette account would presumably be from rental properties' monthly payments—including the use of natural gas provided by CES. The Halims refer to Wilmette's accounts as "trust accounts" or the "Trust Account" however

no written trust agreement exists between Wilmette and any of the Halims' other companies that use the Account; no trust agreement exists Wilmette and its bank referring to the account as a trust, regulating or restricting the use of money, or segregating money, amongst the various entities using the Account. (Def. Resp. ¶24). Defendants deny that the Account is in Wilmette's name alone, and instead assert that Wilmette never had its own bank account, but instead a section within the Account. (Def. Resp. ¶24). The evidence submitted proves otherwise—the title holder of the bank account was "Wilmette Real Estate Management Co. LLC." Doc. 104-6, Exs. A-F. Further, Halim testified that money is freely transferred between Division I, Division II, and the supply account; how the transfers are treated on the books "means nothing" and "the final result is the same." (Halim Dep. p. 216, 235). The "test set forth by the Illinois Supreme Court to determine the validity of a transfer under the fraudulent conveyance statute is, "whether or not it directly tended to or did impair the rights of creditors . . . . A donor may make a conveyance with the most upright intentions, and yet, if the transfer hinders, delays, or defrauds his creditors, it may be set aside as fraudulent."" *In re Martin*, 145 B.R. at 947 (citing *Birney v. Solomon*, 348 Ill. 410, 181 N.E. 318, 320 (1932)). Under Section 160/5(a), the transfer is considered fraudulent whether the creditor's claim arose before or after the transfer was made or the obligation was incurred; under Section 160/6(a), the transfer is fraudulent when the debtor was insolvent at the time or became insolvent as a result.

Specifically, the transfers in October 2008 are revealing. At the time, CES had already filed suit in State Court and the Halims were undeniably contemplating the magnitude of the obligation that Wilmette had incurred. Wilmette's obligation to pay its gas bills constituted CES's claim under Illinois law as of the date the gas bill appeared on the doorstep, so Defendants' argument that CES's claim only arose as of final judgment is unavailing. 740 ILCS 160/2(c) (defining a claim as a "right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal equitable, secured, or unsecured.") Defendants do not dispute that the managed properties paid $1.22 million for the natural gas that CES had provided to those properties. The $1.22 million was logged in the Division I and Division II accounts. Division I and II paid $1.22 million to the supply account, which was then paid as income to Wilmette and logged as a "Gas Sale" transaction. (Halim Dep. p. 237). The $1.22 million was then deposited back into Division I. (Halim Dep. p. 246). Halim wrote two checks from the Division I account—one for $1 million and the other for $220,000—to his personal bank account. (Halim Dep. p. 238-239). Halim testified at his deposition that he and his wife executed the transaction in anticipation of ending Wilmette and beginning WR, specifically to keep the Halims' properties out of the dispute with CES regarding the unpaid gas invoices. (Def. Resp. ¶22). He explained:

> If not, the gas has to be paid. We know that we had a dispute with
> CenterPoint, and we know that we're not going to pay the bills, because we

don't believe these bills are right, and we believe that the million two is just—they stole our gas. They stole our storage, and we said we going to go to court and fight them for this. So this bill—this bills are not going to be paid, so we said, "Let's pay to Wilmette now, and then Wilmette will fight, and then later, we'll see what will happen."

(Halim Dep. p. 248). Halim's deposition attests to the fact that the transfer out of the Wilmette account was voluntary, after the gas bill obligation had accrued, with the intention of leaving Wilmette with insufficient funds to pay the indebtedness. Defendants fail to challenge whether Wilmette received reasonable equivalent value for the transfers, pointing only to the fact that the funds came from the "personal section" of the Wilmette account, and that the funds transferred were not Wilmette's. However, Halim explained that Wilmette's typical business operations included payments either directly or indirectly from the buildings' accounts. In this case, the free-flow of funds amongst the building accounts, supply account and Wilmette account, including sizeable "management fees" out to the Halims' personal accounts, combined with Wilmette's perpetual annual losses (perpetuated by the Halims' frequent and sizeable deductions), indicate that the Halims' transfers out of the Wilmette account left it without sufficient funds to pay the indebtedness.

The Halims' conduct is similar to that of the judgment debtors in *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, in which the defendants admitted that they continuously paid the annual corporate fee for the debtor corporation for the sole purpose of preventing

the successor corporation from being held liable for the judgment debt to the creditor. 419 F.3d 594, 599 (7th Cir. Ill. 2005). The Seventh Circuit likened the conduct to "the caretaker of a wealthy old man, who had obtained control of his assets and didn't want them to go to the man's heirs, plac[ing] him on life support . . . [the debtor corporation] is brain dead, but is being kept on corporate life support in order to prevent [the creditor] from getting hold of any of [the successor corporation]'s assets." *Id.*

The money trail speaks for itself—as does Halim in his deposition. Defendant also argues that the statute of limitations bars CES's claim—an argument which must be waived due to Defendant's untimely pleading. Regardless, according to Section 160/10(b), CES's claim under Sections 160/5(a)(2)(B) and 160/6(a) are governed by a state of limitation period of four years. Because CES's claim arose when Wilmette ceased paying its gas bills in November 2007, the claim is not barred as untimely. 740 ILCS 160/2(c). The reasons stated above attest to the validity of CES's claim against Wilmette's transfers to WR, and consequently Defendants are liable for Wilmette's claim.

Defendants rely on *Fusion Capital* to dispute whether there was fraud under the UFTA and alter ego liability, arguing that CES knew or should have known that Wilmette was a "husk without any cord inside" and consequently cannot collect. *Fusion Capital Fund II, LLC v. Ham*, 614 F.3d 698, 701 (7th Cir. 2010) (citing *Sea-Land Services, Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991) (Illinois law)). In *Fusion*, two companies decided to conduct a

15

reverse merger so that the operating company (fabricating products but unregistered) could merge into the shell company (registered and traded but insolvent) to create a merged company that could be traded publicly and presumably raise equity capital. *Id.* at 699. An investor fund agreed to invest $15 million subject to the merger being consummated; when negotiations failed, the investor bailed. *Id.* at 700. When the shell company sued the investor for tortious interference, the investor prevailed and then sued in the Northern District of Illinois to recover its legal fees. *Id.* On appeal, the Seventh Circuit reversed the district court's ruling that the fund owed $1.2 million in legal fees and that the individual investors, as alter egos of their fund, were personally responsible for the debt. The Court concluded that the element of fraud had not been proven because the investor fund knew from the beginning that the shell company would be unable to pay its debts: its "thin capitalization was both the reason why this deal had been proposed and the dominant feature in the deal's structure." *Id.* at 701. The Court explained that a contracting partner who fails to request a guaranty as part of the business transaction should not receive the legal equivalent of a guaranty when the deal later flounders. *Id.*

However, the present case is far from the complex capital structures of a corporate finance deal. CES was never Wilmette's business *partner*, but rather its *supplier*. Wilmette bought a product on credit from a supplier, distributed the product to its end-users, was paid by its end-users for it, then decided not to pay its supplier. Wilmette 's tenants used

16

CES's gas to stay toasty or cool depending on the finicky Chicago weather and Wilmette happily collected their rent checks. Furthermore, Defendants' argument fails because Wilmette represented to CES in its energy services agreement that Wilmette was "financially able to continue in business, unaware of any situation which would alter its financial abilities and has not filed, planned to file or have had [sic] filed any bankruptcy proceeding." (Pltf. SOAF ¶1). The Halims' actions after that representation to CES, and Halim's deposition testimony about his transfers of funds, betray the Halims' intent to render Wilmette judgment-proof, for which CES's intent and knowledge are immaterial.

Because the Court finds that the Halims fraudulently transferred all of Wilmette's funds out to their personal account so as to avoid paying CES's claim against Wilmette, the Court grants CES's motion and denies Defendants' motion for summary judgment on the fraudulent transfers.

B. **CES's claim of Successor Liability**

The Court also finds WR liable for Wilmette's obligations, for the following reasons. Under Illinois law, the mere transfer of assets does not automatically trigger the transfer of liabilities though a few exceptions exist. *Vernon v. Schuster*, 179 Ill. 2d 338, 688 N.E.2d 1172, 1175, 228 Ill. Dec. 195 (Ill. 1997). Successor liability will be imposed under these exceptions: "(1) an express or implied agreement of assumption exists; (2) where the transaction amounts to a merger of the seller into the buyer or a consolidation of the two;

17

(3) where the buyer is a mere continuation of the seller such as when the buyer comes into existence pursuant to a reorganization of the seller; or (4) the transaction is fraudulent in that it was entered into to allow the seller to escape its liabilities." *Id.*; *see also Upholsterers' Int'l Union Pension Fund v. Artistic Furniture of Pontiac*, 920 F.2d 1323, 1325-1326 (7th Cir. Ill. 1990). In the present case, these exceptions prove terminal to Defendants.

1. **Express and Implied Agreement**

WR expressly agreed to assume Wilmette's liabilities—and the Halims would know, since Halim personally executed the agreement for both WR and for Wilmette. (Pltf. SOF ¶54). The agreement reads: "For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree that, effective as of [September 24th, 2009], Wilmette Real Estate & Management Company LLC assigns all its rights and obligations as managing agent for the properties . . . to WR Property Management LLC." Doc. 85-13, Ex. 16, the Assignment. Defendants fail to dispute the existence, validity or admissibility of the document, which was identified by Halim at his deposition and included as an exhibit. Defendants also fail to dispute in any of their briefings that WR is the successor in liability to Wilmette, thereby conceding the issue. *Palmer v. Marion County*, 327 F.3d 588, 598 (7th Cir. 2003) (stating that arguments not presented to the district court in response to summary judgment motions are waived).

Finding that WR expressly agreed to the assignment of Wilmette's liabilities should be sufficient to establish successor liability and ensure CES may collect from WR, but the Halims have shown their disregard for judicial findings by refusing to pay the final judgment determined by the State Court and thereby precipitating this suit in federal court.

Therefore, lest the Halims disclaim the import of the document, this Court finds that the record indicates that the Halims understood the implications of the agreement, and therefore the agreement was express as well as implied and acknowledged as such. Halim testified that he understood the assignment to be of "all the rights and obligations as a manager managing the building, collect the rent, pay the expenses all of this." Doc. 85-13, p. 276-276, January 19th, 2011 Deposition of Cameel Halim. His only protest at his deposition was that the date on the Assignment could be wrong, which he believes "really doesn't matter" because management was transferred to WR on perhaps a different date. (Halim Dep. p. 278). He believes that an oral transfer of the leases would have sufficed, and this document was drawn up as a notice to tenants of their new management as required by a tenant-landlord ordnance. (Halim Dep. p. 279-280).

2. **Mere Continuation**

Halim does not seems to find it important for tenants to know the name of their management company—although in this situation, where the new company's owners, employees, contact information, and business operations remain the same, his position is

harmless from a tenant's perspective. In a way, Illinois law agrees with his position: if nothing has changed but the name of the company, then it remains the same company and its successor in liability. WR is also the successor in liability under the third exception, for a purchasing corporation who "is merely a continuation or reincarnation of the selling corporation." *Vernon*, 688 N.E.2d at 1176. Illinois courts have held that the "mere continuation" exception hinges on a finding of common ownership in the new and former businesses. *Steel Co. v. Morgan Marshall Indust., Inc.*, 278 Ill. App. 3d 241, 248, 662 N.E.2d 595 , 214 Ill. Dec. 1029 (Ill. App. Ct. 1996); *see also Hoppa*, 259 Ill. App. at 66 ("Absent continuity of stock ownership, a court cannot find that a transferee corporation is merely a continuation of the transferor."). In *Steel Co.*, creditors sought to recover their unpaid invoices from a successor company whose chief executive officer had been the debtor company's owner and sole shareholder. Though he did not hold any shares in the successor company, his wife was its majority shareholder. *Id.* at 248-249. The Illinois appellate court allowed the claim of successor liability to go forward, noting: "[w]e cannot allow the law to be circumvented by an individual exerting control through his spouse." *Id.* at 249. In this case, the common ownership of Wilmette and WR is undisputed. Wilmette's members are the Living Trusts, with Mr. and Mrs. Halim as the trustees of their respective trusts, while WR's members are also the Living Trusts.

It is also undisputed that in January 2009, Halim transferred to WR all of the oral management agreements that purportedly existed between Wilmette and the Halims' properties, all of Wilmette's employees "automatically" became employees of WR, and WR began using the computers, furniture, office equipment, internet address, and telephone number in Wilmette's office space under the same leases for the same rent, conditions and terms—office space that is rented from an entity owned by the Halims. (Pltf. SOF ¶¶48-52, 19). Besides new letterhead and business cards, all of the employees testified that their job responsibilities did not change; tellingly, Mrs. Halim testified that Wilmette and WR are "the same thing" and the change is just a "label." (Pltf. SOF ¶51); see *Hoppa v. Shermerhorn & Co.*, 259 Ill. App. 3d 61, 64 (1st Dist. 1994) (attributing successor liability when "two companies conducted business from the same address using the same telephone number; managed the same property; employed the same staff; and maintained the same bank accounts"). The Halims transferred Wilmette's "oral" management agreements to WR much like when Wilmette received its "oral" management agreements by transfer from its predecessor, Wilmette Real Estate & Management, Inc. (Pltf. SOF ¶18). Halim and his wife transferred the management agreements from Wilmette to WR without negotiation, because as the general partner for the buildings for both Wilmette and WR, he stated: "I don't discuss between myself." (Doc. 85-13, Ex. M, p.253). Defendants make no argument that the transfer from Wilmette to WR was somehow limited to a portion of the buildings

under the management agreements, divided the management agreements' responsibilities between the two corporations, or did not constitute a transfer of assets. *See Lincoln Nat'l Life Ins. Co. v. Nicklau, Inc.*, 2000 U.S. Dist. LEXIS 6936 (N.D. Ill. May 17, 2000) (finding a transfer of a restaurant's name and goodwill to a family member's new restaurant, without consideration, constituted a conveyance subject to the continuity exception, triggering successor liability). The record is sufficient to show that WR is in effect the same business enterprise as Wilmette but "merely wears different clothes." *See In re H. King & Assocs.*, 295 B.R. 246, 278-279 (N.D. Ill. Bankr. 2003). Under Illinois law, this makes WR the successor to Wilmette's liabilities.

v.    **Conclusion**

The Court finds that WR is the successor company to Wilmette and that Halim fraudulently transferred funds from Wilmette to the Halims' personal accounts.  The Court orders the avoidance of the transfer, under Section 8(a)(1), and/or the levy execution of the proceeds of the fraudulent transfers, under Section 8(b), to satisfy CES's claim against Defendants.  The Court awards attorneys' fees, costs and interest to CES.

Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: November 10, 2011